IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | |
|---|---|
| JOHN HALL, ELAINE ROBINSON-STRAYHORN, LINDORA TOUDLE, THOMAS JERKINS,<br><br>*Plaintiffs*,<br><br>v.<br><br>JONES COUNTY BOARD OF COMMISSIONERS; FRANK EMORY, in his official capacity as Chairman; W. MICHAEL HADDOCK, in his official capacity as Vice Chairman; ZACK A. KOONCE III, in his official capacity as Commissioner; SONDRA IPOCK-RIGGS, in her official capacity as Commissioner; JOSEPH F. WIGGINS in his official capacity as Commissioner; FRANKY J. HOWARD, in his official capacity as Jones County Manager; JONES COUNTY BOARD OF ELECTIONS; WILL H. BROCK in his official capacity as Chairman of the Board of Elections;<br><br>*Defendants*. | CIVIL ACTION NO. 4:17-cv-18<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**INTRODUCTION**

1. This action seeks declaratory and injunctive relief to address voting discrimination faced by African-American voters in Jones County, North Carolina, who have been denied an equal opportunity to elect candidates of choice to the Jones County Board of Commissioners in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

2. The African-American residents of Jones County have suffered from a long history of marginalization. This complaint focuses on an important source of African-American

vote dilution in Jones County: an election scheme that violates Section 2 of the Voting Rights Act. When African Americans have less opportunity than other members of the electorate to elect a representative of their choice to the Board of Commissioners to advocate on their behalf, the result is systemic neglect of their needs and concerns.

3. The Jones County Board of Commissioners is a five-member governing body charged with fulfilling the legal duties and responsibilities of the county and making decisions that serve the best interests of its residents. The Board of Commissioners decides how to fund and administer local government services and its decisions impact the quality of life, healthcare, education, and safety of Jones County's residents. The Board of Commissioners also appoints members to other boards and committees that oversee affairs significantly impacting residents of Jones County, including the Board of Elections, the Economic Development Commission, and the Jones County Planning Board.

4. Members are elected to the Board of Commissioners through county-wide at-large elections. This scheme has impeded African-American residents from effectively exercising their voting power and has enabled white voters, voting as a bloc, to prevent African-American voters from electing their candidates of choice. Despite constituting approximately 32.4% of the Jones County total population and 31.8% of the county's voting-age population, African-American voters have not been able to elect candidates of their choice to the Board of Commissioners for over two decades. Although African-American voters have repeatedly and overwhelmingly supported African-American candidates for the Jones County Board of Commissioners, the last time an African-American candidate was elected to the Board of Commissioners was 1994.

5. The consistent defeat of African-American candidates would not have occurred if Jones County had provided for single-member voting districts. The number of voting-age African-American residents of Jones County is sufficiently large and geographically compact to constitute a majority in at least one single-member district. African Americans vote as a cohesive bloc, but their candidates of choice are often defeated by the candidates of the white voters of Jones County. Thus, the at-large election scheme dilutes the African-American vote and deprives African-American voters of an equal opportunity to elect candidates of their choice. Combined with other factors, such as the history of racial discrimination in voting, the perpetuation of racial appeals in elections in Jones County, and the effects of decades of socio-economic discrimination against African Americans throughout North Carolina, the at-large election scheme violates Section 2 of the Voting Rights Act.

6. Plaintiffs seek an order: (i) declaring that the at-large method of electing the Board of Commissioners violates Section 2 of the Voting Rights Act; (ii) enjoining defendants from conducting future elections under the at-large plan; (iii) requiring future elections for the Board of Commissioners be conducted under a single-member district plan that complies with the Constitution and the Voting Rights Act; and (iv) providing any such additional relief as is appropriate.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a), because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act, and pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

8. This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9. This Court has personal jurisdiction over the Defendants, all of whom, on information and belief, are citizens of the State of North Carolina.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because most of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

**The Plaintiffs**

11. Plaintiff JOHN HALL is an African-American registered voter and a resident of Jones County. As a result of the county's at-large election scheme, in election after election, Mr. Hall has been unable to elect candidates of his choice to the Board of Commissioners despite strong electoral support for those candidates from other African-American voters in his community. Mr. Hall resides in an area of Jones County that could constitute a single-member district containing a majority-African-American voting-age population, which, if established, would remedy the existing Section 2 violation alleged herein.

12. Plaintiff ELAINE ROBINSON-STRAYHORN is an African-American registered voter and a resident of Jones County. As a result of the county's at-large election scheme, in election after election, Ms. Strayhorn has been unable to elect candidates of her choice to the Board of Commissioners despite strong electoral support for those candidates from other African-American voters in her community. Ms. Strayhorn resides in an area of Jones County that could constitute a single-member district containing a majority-African-American voting-age population, which, if established, would remedy the existing Section 2 violation alleged herein.

13. In 2014, Ms. Strayhorn ran for a seat on the Board of Commissioners. In the 2014 Democratic primary, Ms. Strayhorn received overwhelming support from African-American voters, but received very little support from white voters. After advancing to the general election, Ms. Strayhorn was defeated after she failed to receive meaningful support from white voters, although she was supported by the vast majority of African-American voters.

14. Plaintiff LINDORA TOUDLE is an African-American registered voter and a resident of Jones County. As a result of the county's at-large election scheme, in election after election, Ms. Toudle has been unable to elect candidates of her choice to the Board of Commissioners despite strong electoral support for those candidates from other African-American voters in her community. Ms. Toudle resides in an area of Jones County that could constitute a single-member district containing a majority-African-American voting-age population, which, if established, would remedy the existing Section 2 violation alleged herein.

15. Plaintiff THOMAS JERKINS is an African-American registered voter and a resident of Jones County. As a result of the county's at-large election scheme, in election after election, Mr. Jerkins has been unable to elect candidates of his choice to the Board of Commissioners despite strong electoral support for those candidates from other African-American voters in his community. Mr. Jerkins resides in an area of Jones County that could constitute a single-member district containing a majority-African-American voting-age population, which, if established, would remedy the existing Section 2 violation alleged herein.

**The Defendants**

16. Jones County is a political subdivision of North Carolina, located within the Eastern District of North Carolina. This action is brought against Jones County officials charged

with ensuring its compliance with applicable state and federal voting laws, including the Voting Rights Act.

17. Defendant JONES COUNTY BOARD OF COMMISSIONERS, established under the North Carolina Constitution and the General Statutes of North Carolina, is the governing authority of the County. N.C.G.S. §§ 153A-10-16. The Board of Commissioners provides local government services in Jones County and has the legislative power to adopt laws affecting its affairs and local government. In particular, the Board of Commissioners has the option to adopt an apportionment plan that divides the county into electoral districts and alter the structure of its electoral scheme from an at-large scheme to a single-member district scheme. N.C.G.S. § 153A-58.

18. Defendants ZACK A. KOONCE III, FRANK EMORY, SONDRA IPOCK-RIGGS, JOSEPH F. WIGGINS, and W. MICHAEL HADDOCK are the current members of the Board of Commissioners. Each Defendant is sued in his or her official capacity.

19. Defendant FRANKY J. HOWARD is the Jones County Manager. He is being sued in his official capacity.

20. Defendant JONES COUNTY BOARD OF ELECTIONS (the "Board of Elections") has statutory powers, duties and responsibilities concerning the conduct of elections held in Jones County; it oversees and is responsible for the administration of elections in the county, including the Board of Commissioners elections at issue in this case. N.C.G.S. § 163-33.

21. Defendant WILL H. BROCK is the Chairman of the Board of Elections for Jones County. He is sued in his official capacity.

## FACTS AND BACKGROUND

**Section 2 of the Voting Rights Act**

22. Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A violation of Section 2 is established, *inter alia*, if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b).

23. Section 2 prohibits the use of an electoral scheme that dilutes the voting strength of minority voters and thereby deprives them of an equal opportunity to elect representatives of their choice.

24. The at-large election scheme used to elect the members of the Jones County Board of Commissioners violates Section 2 because it denies Jones County's African-American voters an equal opportunity to participate in the political process and elect representatives of their choice.

**Jones County Demographics**

25. Jones County is located in southeastern North Carolina. The 2010 decennial Census showed that Jones County had a total population of 10,153 residents, 32.4% of whom were African American "alone" (meaning they identified with that race and no other). It also showed that 31.8% of the voting age population of Jones County was African American alone.

7

26. Recent estimates show that the population of Jones County has not changed significantly. As of 2015, Jones County has an estimated population of 10,013 residents, 30.9% of whom are African American alone.

27. The racial demographics of Jones County, which are the basis for Plaintiffs' proposed alternative single-member district election system, are reflected in Table 1 below:

**Table 1 – Jones County Population (2010 Census)**

| Race | Total Population | | Voting Age Population (VAP) | |
|---|---|---|---|---|
| White Alone | 6,395 | 63.0% | 5,025 | 63.25% |
| Black or African American Alone | 3,289 | 32.4% | 2,524 | 31.8% |
| American Indian and Alaska Native Alone | 57 | 0.6% | 39 | 0.4% |
| Asian Alone | 32 | 0.3% | 29 | 0.3% |
| Native Hawaiian & Other Pacific Islander Alone | 2 | 0.00% | 2 | 0.00% |
| Hispanic/Latino | 398 | 3.9% | 249 | 3.0% |
| Some Other Race Alone | 190 | 1.9% | 1 | 0.00% |
| Two or More Races | 188 | 1.9% | 76 | 0.9% |

**Jones County Board of Commissioners Elections**

28. The five members of the Jones County Board of Commissioners are elected at-large to four-year terms that run concurrently. The elections are held during non-presidential federal election years.

29. Elections for the Board of Commissioners are partisan. Primary elections are held to determine which candidates advance to the general election. Individuals running for the Board of Commissioners do not run for a particular seat on the Board. Instead, the primary ballot lists all candidates from the voter's party who are seeking the party's nomination for the Board of Commissioners. Each primary voter is permitted to cast a vote for up to five

candidates. The top five vote recipients in the primary election receive the party's nomination and advance to the general election.

30. In the general election, voters are again permitted to cast a vote for up to five candidates. The top five vote recipients in the general election win a seat on the Board of Commissioners.

31. Since 1998, in five successive elections, not one African-American candidate has succeeded in winning a seat on the Board of Commissioners, regardless of the level of support received from the African-American community.

32. The last African-American candidate to be elected to the Jones County Board of Commissioners was in 1994, and, upon information and belief, only three African Americans have ever been elected to the Board of Commissioners.

33. In each election since 1998, whenever an African-American candidate prevailed in the primary, he or she was defeated by the white candidates in the general election.

34. In 2002, two African-American candidates, along with three white candidates, advanced from the Democratic primary to the general election for the Board of Commissioners. African-American voters overwhelmingly supported the African-American nominees. White voters overwhelmingly did not support the African-American nominees. The three white Democrats won the general election along with two white Republicans.

35. In 2006, the candidate most preferred by African-American voters lost because of a lack of support from white voters. As a result, no African-American candidate was successful in the primary. Thus, only white candidates were on the ballot in the general election for the Board of Commissioners.

36. In 2010, one African-American candidate, along with four white Democrats, advanced from the Democratic primary to the general election for the Board of Commissioners. African-American voters overwhelmingly supported the African-American nominee. White voters overwhelmingly did not support the African-American nominee. The four white Democrats won the general election along with one white Republican.

37. In 2014, one African-American Democratic candidate advanced to the general election, along with four white candidates. African-American voters overwhelmingly supported the African-American nominee. White voters overwhelmingly did not support the African-American nominee. The four white Democrats won the general election along with one white Republican.

**The At-Large Scheme Prevents African Americans from Electing Their Candidates of Choice**

38. There are three necessary preconditions for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group must be politically cohesive; and (3) the majority must vote sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. Each of these preconditions exists here.

39. Under a single-member district plan, Jones County's African-American population is sufficiently numerous and geographically compact to allow for the creation of a properly-apportioned, single-member district for electing a member of the County Board of Commissioners in which African-American voters would constitute a majority of both the total population and the voting-age population. The African-American community in and around the town of Trenton is sufficiently large and compact to constitute the majority of a single-member district.

40. Jones County's African-American voters are politically cohesive and have voted overwhelmingly for African-American candidates over other candidates in recent county-wide general elections.

41. County-wide elections in Jones County show a clear pattern of racially-polarized voting. Although African-American voters are politically cohesive, bloc voting by other members of the electorate consistently defeats the candidates preferred by African Americans in county-wide elections. White support in county-wide general elections is insufficient for African-American candidates of choice to be elected in Jones County.

42. For example, in the 2002 election for the Board of Commissioners, Bobby Flowers, an African-American candidate, received overwhelming support from African-American voters and nearly no crossover support from other voters, with the result that he failed to win office, having been defeated by white candidates.

43. Also in the 2002 general election for the Board of Commissioners, Leslie Dewey Strayhorn, an African-American candidate, received overwhelming support from African-American voters and nearly no crossover support from other voters, with the result that he failed to win office, having been defeated by white candidates.

44. Mr. Flowers again ran for a seat on the Board of Commissioners in 2006, and secured the support of the vast majority of African-American voters in the Democratic primary election. However, after receiving only a minimal amount of crossover support, he did not advance to the general election.

45. During the next election cycle in 2010, another African American, Jerol Bryant, sought to represent Jones County residents as a member of the Board of Commissioners. He

received the backing of the great majority of African-American voters in the general election, but was unsuccessful when only a minimal number of other voters supported his candidacy.

**The Totality Of The Circumstances Further Demonstrates The Dilutive Effect Of The At-Large System On Jones County's African-American Community's Opportunity To Participate In The Political Process and Elect Candidates Of Their Choice**

46. In addition to the three preconditions noted above, the totality of the circumstances in this case supports Plaintiffs' claim that African-American residents of Jones County have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice to the Board of Commissioners, in violation of Section 2.

47. North Carolina has a long and well-documented history of official discrimination against African-American voters. Despite the ratification of the Fifteenth Amendment in 1870, which prohibited voter discrimination based on race, North Carolina continued to employ literacy tests, poll taxes and other discriminatory devices to obstruct African-American political participation. While progress has been made, this obstruction has persisted for more than a century, with many counties embracing electoral schemes that have been challenged by North Carolina citizens and the United States Department of Justice for unlawful discrimination.

48. This discrimination has suppressed the political participation of African Americans in North Carolina at every level. There is ample evidence that African-American voters have been disempowered at the polls through a "significant history of official discrimination in education, housing, employment and health services in North Carolina[,]" which has made it "more difficult for black citizens to register, vote, and elect candidates of their choice." Anita S. Earls et al., *Voting Rights in North Carolina 1982-2000* at 7-8, *available at* http://www.protectcivilrights.org/pdf/voting/NorthCarolinaVRA.pdf. In turn, "[t]he political

12

participation of African-American voters in North Carolina is further impeded by the fact that they continue to suffer from a disproportionately low position on virtually every measure of socio-economic status." *Id.* at 7.

49. In recent years, the North Carolina General Assembly purposefully discriminated against African-American voters through the passage of various election restrictions and the implementation of an unlawful redistricting scheme that "target[ed] African Americans with almost surgical precision[.]" *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016). The United States Court of Appeals for the Fourth Circuit condemned these actions and the state's "shameful" legacy in *North Carolina State Conference of the NAACP v. McCrory*, finding that "racial discrimination and racially polarized voting are not ancient history" in North Carolina. *Id.* at 221, 223.

50. During the 2010 Jones County Sheriff's election, the campaign signs of an African-American candidate were removed or defaced, and upon information and belief, appeals to voters were made to oppose his candidacy on the basis of his race.

51. The denial of the right of African-American residents in Jones County to have an equal opportunity to participate in the political process and elect candidates of their choice to the Board of Commissioners has resulted in a Board of Commissioners that is not responsive to the particular needs of Jones County's African-American residents.

52. The Board of Commissioners is responsible for making decisions about a variety of issues that significantly impact Jones County residents, including public spending, quality of life, healthcare, education, and safety. Residents of Jones County who live in the predominantly African-American unincorporated areas just outside the town limits of Trenton are not represented on the Town Council of Trenton, as these residents are barred from voting in local

Trenton elections. These residents depend solely on the Board of Commissioners to address important issues such as sewage access, street lights, flooding concerns, and paving of roads.

53. The Board of Commissioners' meeting minutes reflect that it has repeatedly ignored or failed to address issues important to Jones County's African-American community.

54. In July and August 2014, African-American residents of Jones County petitioned the Board of Commissioners to consider changing the at-large system for electing County Commissioners to a district-based system to provide "a better opportunity for minorities to win elections." Upon information and belief, the Board of Commissioners has never addressed this request.

55. As a result of the history of official and private discrimination, African-American residents of Jones County have lower rates of educational attainment than white residents and experience poverty and unemployment at rates that are at least twice as high as those of Jones County's white residents. African-American students in Jones County's schools continue to face discrimination. These effects of discrimination hinder the ability of Jones County's African-American residents to participate effectively in the political process.

## COUNT ONE:
## VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965

56. Plaintiffs repeat and re-allege each and every allegation contained in Paragraphs 1 to 55 above, as if fully set forth herein.

57. Jones County's African-American population is sufficiently numerous and geographically compact to allow for the creation of one properly-apportioned, single-member district for electing a member of the Board of Commissioners in which African-American voters would constitute a majority of both the total population and the voting-age population. Jones

County's African-American voters are politically cohesive, and elections in Jones County show a clear pattern of racially polarized voting.

58. The totality of the circumstances establishes that the at-large election scheme currently in place has the effect of denying African-American voters an equal opportunity to participate in the political process and to elect representatives of their choice by diluting their voting strength, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

59. Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Board of Commissioners using the current, unlawful at-large scheme.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that the Court:

a) Declare that the current at-large election scheme for the Board of Commissioners violates Section 2 of the Voting Rights Act;

b) Enjoin Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections in Jones County, North Carolina under the current at-large election scheme for the Board of Commissioners;

c) Order the implementation of a new districting plan for the Jones County Board of Commissioners that complies with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

d) Award plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action; and,

e) Order any such additional relief as the interests of justice may require.

Dated: February 13, 2017	Respectfully submitted,

By: /s/ Burton Craige

Burton Craige, NCSB 9180
bcraige@pathlaw.com
Paul E. Smith, NCSB 45014
psmith@pathlaw.com
PATTERSON HARKAVY LLP
100 Europa Dr. Suite 420
Chapel Hill, NC 27517
Telephone: (919) 942-5200
Facsimile: (866) 397-8671

Ezra D. Rosenberg  (*special appearance – to be filed*)
D.C. Bar No. 360927
erosenberg@lawyerscommittee.org
Dorian Spence (*special appearance – to be filed*)
Md. Bar No. 0912170195
dspence@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1401 New York Ave., N.W. Suite 400
Washington, D.C. 20005
Telephone: (202) 662-8600

Jonathan Blackman (*special appearance – to be filed*)
N.Y. Bar No. 1548262
jblackman@cgsh.com
Lina Bensman (*special appearance – to be filed*)
N.Y. Bar No. 5028667
lbensman@cgsh.com
Pascale Bibi (*special appearance – to be filed*)
N.Y. Bar No. 5314281
pbibi@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000